UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
HOWARD NORTON,

                Plaintiff,

        -against-

TOWN OF ISLIP, et al,

                Defendants.
----------------------------------------------------------------X

Docket No.: 04 CV 3079


**MEMORANDUM OF LAW IN OPPOSITITON TO THE
SUMMARY JUDGMENT MOTION OF THE INDIVIDUAL DEFENDANTS**


LEEDS BROWN LAW, P.C.
*Attorneys for Plaintiff*
One Old Country Road, Suite 347
Carle Place, N.Y. 11514
(516) 873-9550

**TABLE OF CONTENTS**

Page

STATEMENT OF FACTS ..................................................................................................1

SUMMARY JUDGMENT STANDARD ........................................................................13

ARGUMENT

      I.      Malicious Prosecution..............................................................................13

      II.     Heien v. North Carolina...........................................................................31

      III.    Proximate Cause ......................................................................................38

      IV.    Qualified Immunity..................................................................................39

      V.     Huml's Involvement .................................................................................39

CONCLUSION.................................................................................................................40

## STATEMENT OF FACTS

In 1986, Howard Norton ("Norton") purchased property at 725 Ferndale Boulevard ("Property") in the Town of Islip ("Town"). 56.1 ¶ 15. The house on the Property ("House") had been used as a two-family dwelling since 1933, before the time that the Town required or issued certificates of occupancy ("C/O") (Ex. 41, Memo from Joan Ely, 10-14-1988) and long before the Town designated its neighborhood as a one-family zoning district in the 1960's. 56.1 ¶ 4. After the Town's one-family zoning district was implemented, the House and Property was designated a "legal non-conforming use", which meant the Property and House could still be used as a two-family dwelling, despite the neighborhood's new zoning designation. 56.1 ¶¶ 4, 5. The Town officially recognized the Property as having a legal non-conforming use on April 27, 1965. 56.1 ¶ 6.

In March 1984, a fire occurred at the Property. 56.1 ¶ 13. After the fire, the apartment on the north side of the House was continually occupied from March 1984 until Plaintiff purchased the House in 1986, and the apartment on the south side of the House was occupied sporadically from March 1984 until the Plaintiff purchased the Property. There was never a period when the House was unoccupied for a period of one consecutive year. 56.1 ¶ 14.

In 1988, Norton applied for a rental permit for the Property. 56.1 ¶ 17. On April 13, 1988, the Town's Building Department ("Building Department") issued a certificate to Norton confirming that the Property "may be occupied" for two-family dwelling use. 56.1 ¶ 97. Despite this, the same Town denied Norton a rental permit one month later, on May 14, 1988. 56.1 ¶ 18, A-465. Nine days after the denial, the Town issued Norton another certificate confirming that the Property continued to enjoy its non-conforming use status. 56.1 ¶ 51.

On August 24, 1988, Norton filed an Article 78 petition in Suffolk County Supreme

Court, challenging the Town's denial of a rental permit. 56.1 ¶ 20, A-307-08. The Town defended its denial by alleging that the Property had lost its non-conforming use status after the 1984 fire, when the House was allegedly vacant for more than one year. 56.1 ¶¶ 21, 22. While Norton's Article 78 petition was pending, and in contrast to the position the Town was taking opposing Norton, the Town issued a revised certificate, again confirming the Property and House enjoyed two-family legal non-conforming use status. 56.1 ¶ 97.

The Suffolk County Supreme Court ultimately denied Norton's Article 78 petition, holding that the Town was "not empowered to pass on the establishment of a non-conforming use, which in this case, at this point, is a prerequisite to the issuance of a rental permit." 56.1 ¶ 24. The court added, "since a question of the nonconforming aspect had arisen"… the Town "had to, under Sec. 68-20 refer the matter to the [Town Zoning] Board of Appeals, and could not issue a permit (Sec. 27-94) in the face of conditions determined by it, correctly or not, in violation of the Code." 56.1 ¶ 24. Finally, the court found that, "only the [Town's Zoning] Board of Appeals" could determine whether the Property "is a legal non-conforming two family structure." On a motion for reconsideration, the court again held that "the establishment of whether or not such [legal non-conforming use] status was lost, was the function of the [Town's] Zoning Board of Appeals." 56.1 ¶ 25.

Despite the court's holding that the Town could not determine whether the non-conforming use was lost, and despite the court's instruction to the Town to refer the matter to its Zoning Board of Appeals ("BZA") for a determination of this issue, the Town did not initiate any administrative proceeding before the BZA regarding the Property's non-conforming use. 56.1 Counterstatement G. The Town took no official action to formally revoke the Property's non-conforming use status, continued to assess and tax the Property as a two-family house, and

even issued yet another certificate confirming the Property's legal non-conforming use status in January 1990. 56.1 ¶ 96.

In early to mid-1990, Town Building Department Commissioner Rim Giedraitis ("Giedraitis") placed the following notations on the Building Department's cardboard unsigned and unissued Building Division Certificate[1] for the Property ("Certificate") (T50, T57-58):

> *Fire to Structure 26 Mar 84   Premises vacated   Repair Fire Damage Permit Required Prior To Reoccupancy
>
> *Rental permit for two-family DENIED 23 Mar 88   Non-conforming use of two-family lost due to non-use in excess of one consecutive year and failure to apply for repair permits.  Denial sustained by SCS court 27 Feb 89. Withdrawal from Court of Appeals 23 Mar 90.

56.1, 28. When asked if the notation relating to the loss of the non-conforming use "adversely affects" Norton's rights to use the Property in this manner, Giedraitis responded, "Of course it does." T72. Paradoxically, however, Giedraitis said that he did not intend for the notations to be relied upon as an indication that the Property's non-conforming use status had been revoked. Instead, he testified that "the only purpose" of the notations was to inform future property buyers they should read the Suffolk County Supreme Court's decision:

> "What this says is there was a decision by the Court. You want more details, go to the decision. That's what this says. That's the only purpose of this statement. Go to the decision. It means there is something that affected the use of this property, and any subsequent property owner before he buys the property is going to say what does this mean. Go to the Suffolk County Supreme Court decision and read it. You cannot summarize a ten page document on two lines and be completely clear as to all the ramifications."

T67-68. Neither Giedraitis nor anyone else from the Town informed Norton that the notations had been placed on the Certificate. 56.1 Counterstatement H Giedraitis said that Norton had no right to appeal his determination to place the notations on the Certificate. T64.

---

[1] Although a "Building Division Certificate" is not a C/O, some Town personnel vernacularly referred to it as such (56.1¶ 50), and prior filings and rulings in this case and in Norton I have sometimes used the "Certificate" and "C/O" interchangeably.

Five years passed during which the Town did not try to formally revoke the Property's legal non-conforming use status, did not notify Norton that the notations had been placed on his Certificate, and continued to assess and tax the Property as containing a two-family.

On or about September 15, 1995, Olmeda inspected the Property. 56.1 ¶ 43. Although he did not speak to anyone at the Property or enter the House, he nonetheless completed a Notice of Violation which stated, "THE FOLLOWING VIOLATION(S) OF THE CODE OF THE TOWN OF ISLIP WERE NOTED AT THE ABOVE CAPTIONED PROPERTY BY INSPECTOR CRAIG OLMEDA…" E18. (Emphasis in original.) Even though Olmeda had no evidence to support his contention, his Notice of Violation asserted that Norton was "Renting w/o Permit" in violation of Town Code 27-92A 56.1 ¶ 45, E18.

On October 4, 1995, Olmeda prepared a Summons Request Form (also known as an Inspection Information), "requesting that a prosecution summons be undertaken" for violation of Town Code § 27-92, renting without a permit. 56.1, 45, E3. At his deposition, Olmeda was repeatedly asked about the contradiction between not speaking to anyone at the House to confirm how it was being used, but nonetheless requesting a prosecution for renting without a permit. Olmeda confirmed that he had no idea if the House was being rented, but just trusted the information that he had received in a "complaint". T2060, pp. 54-57. When asked, "One way or another you had no basis to conclude that there was a violation at the premises; is that correct?" Olmeda answered, "That's why we sent the complaint to the owner. He is supposed to call me and show me whether the complaint is right or wrong." T2061, p. 59.

Despite the complete lack of a basis to believe Norton was actually renting the House, Olmeda sent his Town Code § 27-92 "Summon Requested" draft to Giedraitis. 56.1 ¶ 45. Giedraitis instructed Olmeda to add "68-40 illegal 2 family, Lost non conforming use" to the

4

form. T2066, p. 79; 56.1, 45. Olmeda did so, changed the date he had previously written on the document from October 4, 1995 to October 12, 1995) and on October 12, 1995 sent, to Town Law Enforcement Division, a request it issue Norton a "Summon". 56.1 ¶ 45.

In 1997, Defendant Joanne Huml ("Huml"), who was in charge of the Town's Law Enforcement Division, assigned a file relating to the Property to Defendant Ronald Stabile ("Stabile"), a Town Law Enforcement Investigator. 56.1 ¶ 68. The file Stabile was given contained three documents – a Notice of Violation, a document entitled "Building Division Certificate", and the October 12, 1995 Summons Request Form completed by Olmeda. 56.1 ¶ 69.

While Stabile testified that he usually would go to the Building Department to confirm that the "C/O" he had been supplied was the same as the one in the file he was provided, he cannot recall whether he did so in this case. 56.1 ¶ 62. It is undisputed, however, that the Certificate on which Stabile relied was a copy of only the front side of a document, was unsigned and uncertified. 56.1 ¶ 81.

On March 5, 1997, Stabile visited the Property to perform an investigation. 56.1 ¶ 67; A-345. Stabile took notes, indicating,  among other things, information about bedrooms and bathrooms. A-764. While at the Property, Stabile spoke with a woman named "Irma." T1075-77. Stabile did not know who Irma was, and had no idea whether she was a guest or a resident. Id. Stabile did not ask anyone at the House if they were renters, or even if they actually lived there. T1081.

On March 20, 1997, Stabile signed an accusatory instrument against Norton, in which he said that he had "personal knowledge" that Norton "DID USE SAID PREMISES, A LEGAL ONE FAMILY DWELLING AS A TWO FAMILY DWELLING…SUCH USE IS INCONSISTENT WITH THE LAST ISSUED CERTIFICATE OF OCCUPANCY." A-200.

5

(Emphasis in Original.) This violation carried a penalty of a fine up to $1,000, up to 15 days imprisonment, or both. A-200.

After Stabile completed the accusatory instrument, he gave it to his supervisor, Huml. T1012, p. 77. On May 14, 1997, Norton was arraigned on the criminal charge in Suffolk County District Court. 56.1 Counterstatement C. Norton was released on his own recognizance pending a criminal trial. 56.1 Counterstatement F. On September 12, 1997, in response to a request from Norton's attorney, Huml faxed Norton's counsel an unsigned, unsealed, and undated Certificate that contained that bore a "Dept Copy" stamp above its signature line. 56.1 ¶ 89; A-202-03. Even though Norton's attorney asked "please fax to me a copy of the certificate of occupancy in your file that contained references to the alleged vacancy of the premises for more than one year which purportedly resulted in the loss of the legal non-conforming use and which also referred to the Article 78 proceeding brought by Mr. Norton" (Ex. 18), Huml did not provide a copy of the certificate's reverse face. 56.1 ¶ 89; A-202-03

Although Norton was charged with a criminal violation, he was not prosecuted by Assistant District Attorneys from the Suffolk County District Attorney's Office ("DA"). Instead, his prosecutors were Town attorneys, most of whom had been designated by the DA as Special Assistant District Attorneys ("SADA") (*see, e.g.,* 56.1 ¶¶ 107, 127).

The DA did not monitor the prosecutions undertaken by SADA's, did not keep an active list of such prosecutions, performed no review of the charging documents or criminal informations brought by SADA's, did not keep an active list of such prosecutions, performed no review of the charging documents or criminal informations brought by SADA's, and did not supervise or monitor such prosecutions in any manner. County 56.1 ¶ 10.

The DA also failed to train SADAs or otherwise insure that SADAs were properly

trained. In contrast, ADAs would receive formal training from other staff members relative to criminal procedure law and ethics (County Ex. H, pp. 32-33); ADAs were provided "ongoing inhouse legal education dealing with matters of prosecution, presentation, motion practice, basically the ins and outs of day-to-day practice as a prosecutor" (Id. at 32-33); all ADAs were given the opportunity to fulfill all their CLE requirements through classes that were offered in-house (Id. at 33); there was education about the professional code of conduct for prosecutors and the ethical opinions relating to the code (Id. at 34-35); and ADAs received a 188-page Operations Manual (Ex. 43). The DA's Office offered none of this training to its SADAs. (County Ex. H, pp. 36-37). In fact, it provided them with no training whatsoever. Id. at 88. SADAs were not provided with a copy of applicable codes of professional responsibility for prosecutors or ethical opinions related thereto, and did not even get a copy of the DA's Office Operations Manual. Id. at 38, 66. In fact, a 30(b)(6) witness for the County admitted that, once a SADA was sworn in, they "would basically be out of sight, out of mind". Id. at 42. Also see County Ex. I, pp. 30-36.

SADA's also received little to no training from the Town Attorney's Office regarding prosecutions. Vincent Messina ("Messina"), Town Attorney for the entirety of the period that Norton was prosecuted, stated there was "no formal training program" for Assistant Town Attorneys in his office, that they received no manuals, and that he does not ever recall the Town Attorney's Office issuing memos or updates on developments in the law. T474-75. To the extent he spoke of training, he only said that Assistant Town Attorneys "may be paired up with more experienced attorneys on certain things" and "may work with them initially with certain things." T474.

On October 8, 1997, Norton moved to dismiss the criminal charge. A-668-69. He argued

that since the Certificate on which the Town based its prosecution was unsigned, unsealed, and undated, that it was of no force and effect. A-670-73. He also argued that the "last issued certificate of occupancy" was actually the certificate issued on January 3, 1990, which allowed two-family use. Id.

In opposition to Norton's motion, the Town filed a new front side certificate with the court. A-204. This certificate was signed and dated October 21, 1997 – almost seven months after the Norton criminal action had commenced. A-201, 204. On March 17, 1998, the criminal court denied Norton's motion to dismiss in a two-sentence order, stating, "[T]he moving and answering papers raise factual issues that are properly the subject of a determination on the merits at trial." A-666.

On November 2, 1998, while the criminal charges were still pending, Norton filed a federal action against the Town and two Town officers in their official capacities. ("Norton I".) Norton I was a § 1983 action which alleged the defendants had violated Norton's procedural and substantive due process rights when they "revoked" his right to maintain a legal non-conforming use without notice and an opportunity to be heard.  A-102-13. While Norton I was pending, Norton's criminal case was repeatedly adjourned. 56.1 ¶ 100.

On January 2, 2003, Hon. Judge Nicholas Garaufis granted Norton's application for a declaratory judgment, holding that the "1990 C/O was the last validly issued C/O for his premises and that the Premises will continue to enjoy its status as a nonconforming use until the Town revokes this status in a manner conforming with the requirements of due process." Norton v. Town of Islip, 239 F. Supp. 2d 264, 276 (E.D.N.Y. 2003). Judge Garaufis also held that, "Defendants have provided no legal support for the proposition that the property right here in question, one which vested as a result of the issuance of an official Town permit and which has

8

been relied on by the owner in expending significant investments, may terminate by operation of law, without any affirmative act by the Town" and that the Town did not "afford [Norton] the most rudimentary elements of due process." Norton I, 239 F. Supp. 2d at 271, 276.

Following the ruling, Norton's attorney wrote to the Town twice, requesting that the criminal charge against Norton be dismissed based on Judge Garaufis' holdings. 56.1 ¶ 104. The Town did not respond to either letter. 56.1 ¶ 104. On February 10, 2003, Norton moved to dismiss the criminal charge, arguing that the Norton I ruling constituted unquestionable documentary proof there was a legal impediment to his conviction on the charged offense. A-873-81. In response to the motion, the Town sought, via Order to Show Cause, a stay of the criminal prosecution while it pursued an appeal of Judge Garaufis' decision to the Second Circuit. A-921-25. The criminal court did not sign the Town's proposed Order. While his motion to dismiss the charge was pending, Norton was forced to appear in criminal court three times – on February 19, 2003, March 12, 2003 and March 26, 2003. 56.1 Counterstatement C.

On April 23, 2003, the criminal court granted Norton's motion to dismiss, holding that, "[t]here is neither a legal nor a factual predicate put forth by the People in opposition to the motion." A-800.

On October 9, 2003, the Second Circuit issued a summary order affirming Judge Garaufis' ruling. Norton v. Town of Islip, 2003 WL 22318570 (2d Cir. 2003). On June 14, 2004, the United States Supreme Court denied the Town's petition for certiorari. Town of Islip v. Norton,  542 U.S. 903 (2004).

On July 21, 2004, this action ("Norton II") was commenced, raising new claims of malicious prosecution and malicious abuse of process against certain Town officers and Monell claims against the Town and Suffolk County. Dkt. 1.

Before discovery was conducted, Defendants moved for summary judgment. Dkt. 93, Town and Indiv. Def. Mot.; Dkt. 101, County Mot. The Court granted the motions in part and denied them in part. Dkt. 104 (Judge Garaufis Memorandum & Order, 3-27-09). The Court held: (1) absolute immunity barred the federal claims seeking money damages from Defendants Richard Sherman, J. Timothy Shea, Jr., Vincent J. Messina, and Richard Hoffman; (2) Huml was not entitled to federal absolute immunity; (3) Huml and Stabile were not entitled to federal qualified immunity; (4) the motions filed by the County and the Town were denied in full; and (5) all Defendants' motions challenging Plaintiff's claim for a declaratory judgment were denied. Id. The Order did not address immunity or liability under New York law. Id. In reaching his decision, Judge Garaufis held, _inter alia_, that "[h]ere, the Criminal Action first charged Norton with violating an invalid C/O, and then sought to hold him retroactively liable for violating the 1997 C/O, a document created after the Criminal Action was commenced [] [t]he premise of the Criminal Action was so plainly deficient that the lack of justification was clear." Id.

On appeal, the Second Circuit reversed in part. Norton II, 378 F. App'x at 90. It held that individual defendants were entitled to qualified immunity from Norton's federal claims because, although it would have been a "mistake" for Individual Defendants to believe there was probable cause, that mistake for federal qualified immunity purposes was "objectively reasonable." Id. at 89. The Second Circuit based its finding of reasonableness on the fact that the Individual Defendants "were confronted with two items of information at the time they chose to prosecute plaintiff. First, the Individual Defendants had the Department Copy Certificate--the unsigned, unsealed, and undated certificate of occupancy marked 'DEPT. COPY'--that contained notations explaining that the house's legal nonconforming use had been 'lost.' Second, a Town investigator had visited the house to confirm that it was being used as a two-family dwelling." Id. at 88.

As outlined below, however, at a deposition on July 1, 2014, over four years after the Second Circuit's ruling, Stabile suddenly contradicted his prior statements about his investigation and admitted that he had no basis to believe that the House was being used as a two-family dwelling. T1081-82. Instead, he conceded that he only wrote the criminal summons based on the House being "arranged and designed" as a two-family. Id.

On remand, the Court granted the renewed motions for summary judgment filed by Messina, Hoffman, Huml, Sherman, and Stabile. Dkt. 143 at 6. The Court held that because Messina and Hoffman had engaged in prosecutorial rather than investigative conduct, they were entitled to absolute immunity under New York state law. Id. Relying on its previous summary judgment decision, the Court held that Huml, Sherman, and Stabile were entitled to state law qualified immunity because their investigatory conduct had a "reasonable basis" in law. Id. The Court also denied the summary judgment motions filed by the County and the Town in full, holding on Monell liability that, "Suffolk County has alleged no new facts-actually, no facts at all-to demonstrate that Norton's Monell claim is insufficient or should be resolved on summary judgment" and that "[f]or the same reasons the court rejected Suffolk County's arguments on these points, the court rejects Islip's arguments here." Id. at 9.

On September 15, 2011, Defendants filed another reconsideration motion, arguing that the Town could not be held liable under Monell. The Court denied Defendants' motion. It did, however, hold that "[a]ny remaining state law claim against the Town of Islip for malicious prosecution is dismissed." Dkt. 149, p. 3, fn. 1.

On May 23, 2012, Norton moved for reconsideration, arguing that, (1) the court erroneously failed to apply New York's bad faith exception to qualified immunity regarding the NY malicious prosecution claims against Sherman, Huml, and Stabile; and (2) its subsequent

dismissal of those claims against the Town, which was "presumably based on this Court's prior dismissal of Plaintiffs malicious prosecution claims" against those Individual Defendants, was also erroneous. Dkt. 155-1 at 2-4.

The Court agreed with Norton, finding that it had "committed clear error and overlooked controlling authority when it failed to apply the bad faith exception to New York qualified immunity law". Dkt. 160, pg. 8. Specifically, the Court held that, "under New York law a defendant's claim of qualified immunity is undone by her failure to disprove *either* unreasonableness *or* bad faith." Id. at 10. (Emphasis in original.) The Court found these are often "fact intensive" questions which are "best resolved by a jury." Id. at 9-10. The Court held that since individual defendants had not met their burden of disproving unreasonableness or bad faith, that the municipality was still liable. "Unlike cases brought under § 1983, municipalities may be liable for the common law torts, like false arrest and malicious prosecution, committed by their employees under the doctrine of respondeat superior… [Because] the Court cannot determine whether [the Individual Defendants] acted unreasonably or in bad faith, the Court cannot find as a matter of law that [the Individual Defendants] or the [Town] are entitled to immunity." Id. at 12.

Finally, the Court rejected the argument that, since the Second Circuit had found that the Defendants' conduct was "objectively reasonable" then it must also have been in good faith. The Court held, "that it was objectively reasonable for [the individual defendant] to believe that he was not engaged in malicious prosecution does not necessarily foreclose a reasonable jury from concluding that he was [engaged in malicious prosecution, an element of which is malice]', which is reflected by the fact that here, after finding that the conduct of the Investigative Defendants was objectively reasonable, the Second Circuit remanded for this court to decide the

state law immunity question…" Id. at 10.

The Court did, however, grant the individual defendants and the Town "leave to file a renewed motion for summary judgment on the basis of qualified immunity as set forth above." Id. at 13. In part, that renewed motion has been brought here.

**SUMMARY JUDGMENT STANDARD**

The judicial standard applied in granting a motion for summary judgment is narrow because the motion must be denied if any genuine issue of fact exists. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Granting of a motion for summary judgment is a drastic remedy which must be used sparingly. Gallo v. Prudential Residential Serv., 22 F. 3d 1219 (2d. Cir. 1994); Egelston v. State Univ. College, 535 F. 2d 752 (2d Cir 1976). It is drastic because it has *res judicata* effect and deprives the litigant of his day in court and his opportunity to cross-examine the movant and movant's witnesses. Eastway Contr. Corp. v. City of N.Y., 762 F.2d 243 (2d. Cir. 1985), cert. denied, 484 U.S. 918 (1987); Egelston, 535 F.2d at 754.

If there is any doubt as to the existence of a material issue of fact or if one is even arguable, summary judgment must be denied. Jaroslawicz v. Seedman, 528 F.2d 727, 731 (2d. Cir. 1975). The district court is limited in granting summary judgment because the court must carefully scrutinize the proofs in the light which is most favorable to the non-movant and accord the non-movant the full benefits of all favorable inferences. Howlett v. Birkdale Shipping Co., S.A., 512 U.S. 92 (1994); Waters v. Churchill, 511 U.S. 611 (1994).

**ARGUMENT**

## I.   **Malicious Prosecution**

In New York, the elements of a malicious prosecution claim are: "(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the

13

termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding and (4) actual malice." Roberts v. City of N.Y., 34 N.Y.3d 991, 992-93 (2019). The Defendants contest Norton's ability to meet elements three and four.[2]

### A.    Absence of Probable Cause

This Court and the Second Circuit have already confirmed that probable cause for Norton's prosecution was lacking. However, in addition to relying on those holdings, Norton can independently show that there was no probable cause at the time the prosecution was initiated, and that even if, *arguendo*, probable cause did exist when the prosecution was commenced, it vitiated thereafter.

### 1.    *This Court and the Second Circuit have Already Found there was No Probable Cause*

Judge Garaufis has held that, "[t]here was no probable cause for the proceeding because it was premised on an alleged violation of an invalid document..." and "[t]here was no probable cause to support the Criminal Action". Dkt. 104, p. 37, 40-41. Huml and Stabile appealed this decision. While the Second Circuit reversed in part and remanded, it did not disturb the portion of Judge Garaufis' order finding lack of probable cause. On the contrary, it held that while it was "objectively reasonable for the individual defendants to believe…that there was probable cause to prosecute plaintiff," that belief "would have been a mistake." Norton v. Town of Islip, 378 Fed Appx. 85, 89 (2d Cir. 2010). Thus, the Second Circuit's finding necessarily implies that

---

[2] The Individual Defendants' briefly mention in a footnote that "the charge is not defined as a crime under New York law, and courts hearing mere zoning code violation charges–like a traffic court–essentially never impose a jail sentence." However, the Accusatory Instrument issued against Norton states that the "violation is punishable by a fine not exceeding one thousand dollars ($1000) or by imprisonment not exceeding fifteen (15) days or by both fine and imprisonment." A-200. Further, both this Court and the Second Circuit Court of Appeals have described the Town's prosecution of Norton as a "criminal action". Dkt. 104, pp. 3, 5, 6, 8, etc.; Norton v. Town of Islip, 378 F. App'x 85, 86 (2d Cir. 2010).

there was no probable cause as any finding that there was probable cause was a "mistake."

Following the Second Circuit's decision, the Town argued that the appellate court held probable cause existed. Judge Garaufis rejected this misreading of the Circuit's decision, holding,

> Defendants seem to argue that the <u>Monell</u> claim against Islip must fail because the Circuit held that probable caused existed to prosecute Plaintiff. [] The Circuit, however, found *arguable* probable cause in ruling on the issue of qualified immunity for the individual town defendants; there was no finding of actual probable cause for either the individual defendants or the Town defendant. The Circuit Court explicitly stated that "it would have been a mistake for the individual defendants to rely on those notations as a basis for probable cause." [] The Circuit went on to merely find that at the time, this reliance was a "reasonable mistake" which entitled the individual defendants to qualified immunity on the federal-law claim. [] Furthermore, as this court mentioned in its Order denying summary judgment, "there is no logical inconsistency with the court concluding the Individual Defendants acted 'reasonably' and that [the municipality's] policies and procedures regarding its criminal prosecution of zoning violations are constitutionally violative."

Dkt. 149, p. 4. (Internal citations omitted) (emphasis in original). This is the law of the case. Any of the Defendants could have appealed the Circuit's 2010 ruling, but choose not to. Finding that there was no probable cause now would not only be outside this Court's purview (as it would, essentially, amount to overruling the Second Circuit), it would also be fundamentally unfair to Norton, who has operated for nearly a decade in reliance on the Second Circuit's and Judge Garaufis' undisturbed decisions.

### 2. *Absence of Probable Cause at Initiation of the Prosecution*

The Accusatory Instrument alleges:

> Howard Norton ... committed the following violation(s) of the Code of the Town of Islip in that (s)he did wrongfully violate the Code of the Town of Islip, section: 68-40, CHANGE OF OCCUPANCY IN THAT: NO OCCUPANCY OR USE SHALL BE MADE OF LAND OR A BUILDING THAT IS NOT CONSISTENT WITH THE LAST ISSUED CERTIFICATE FOR SUCH BUILDING OR USE OF LAND UNLESS A PERMIT IS SECURED; TO WIT: HOWARD NORTON ... ON 5TH DAY OF MARCH, 1997, AT 7:50 P.M. AS OWNER DID USE SAID PREMISE, A LEGAL

ONE FAMILY DWELLING AS A TWO FAMILY DWELLING. SAID PREMISE CONTAINS TWO SEPARATE KITCHENS, BATHS, SLEEPING AREAS, AND ENTRANCES. SUCH USE IS INCONSISTENT WITH THE LAST ISSUED CERTIFICATE OF OCCUPANCY.

A-200. (Emphasis in original.) Thus, the elements for the violation that Norton was charged with were (1) Norton <u>used</u> the Property for two-family dwelling purposes, and that (2) such use was inconsistent with the Property's last-issued C/O.

In New York malicious prosecution actions, probable cause "consists of such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty". <u>Colon v City of New York</u>, 60 N.Y.2d 78, 82 (1983); <u>Boyd v. City of New York</u>, 336 F.3d 72, 76 (2d Cir. 2003) (same). Although a mistake of fact as to the identity of the criminal might not void probable cause, a failure to make further inquiry when a reasonable person would have done so may evidence a lack of probable cause. <u>Colon</u>, 60 N.Y.2d 82. Also, "New York law has long equated the civil defendant's failure to make a full and complete statement of the facts to the District Attorney or the court, or holding back information that might have affected the results, with that defendant's initiation of a malicious prosecution". Ramos v City of New York, 285 A.D.2d 284, 299-300 (1st Dep't 2001); <u>Davis v. City of N.Y.</u>, 373 F. Supp. 2d 322, 336 (S.D.N.Y. 2005).

Here, in addition to the law of the case, probable cause was lacking for both criminal elements because Stabile had no idea whether Norton was <u>using</u> the Property for two-family dwelling purposes, and even if the Property was being <u>used</u> for two-family dwelling purposes, there was no basis to believe such use was inconsistent with the last issued C/O.

16

a)   Stabile did not Have Probable Cause to Believe that the House was Being Used as a Two-Family

(1)   Stabile did not investigate the use of the Property

In Stabile's first deposition, on September 15, 2000, he said that after he was assigned to this case he, "went out to the house, did an inspection, saw that there was a violation and issued a summons." T999, p. 27. Then he signed a declaration in which he stated, "On March 5, 1997, I went to the subject house and confirmed first-hand that it was being occupied by two separate sets of families who were renting the house from Norton." E7, ¶ 7. In his Interrogatory Responses, Stabile stated that he "went to the subject house and confirmed first-hand that it was being occupied by two separate sets of families who were renting the house from Norton." Ex. 44, Stabile Response to Interrogatories, ¶ 20.

On July 1, 2014, Stabile was deposed again and abandoned this testimony. Instead, Stabile testified he had no idea if the House's occupants were guests, renters or something else, and in any case, did not care. Stabile's notes from his visit to the Property indicate that he spoke to a woman named "Irma" while he was there. Stabile was asked about Irma and testified:

Q.  Did you know who Irma was?
A.  No.
Q.  **Did you know if she was a guest there?**
A.  **No. I don't write [the summons] on who is living there. I write on how the house is arranged and designed.**

T1076-77. (Emphasis added.)

Q.  But based on your investigation, you don't know who Irma was?
MR. SERFATY: Objection.
A.  No.
Q.  **So, you didn't know if she was renting the property from him?**
A.  **No. It didn't matter to me. I wrote [the summons] on how the house was arranged or designed. I didn't care who was living there. It didn't matter.**
Q.  **It sounds like according to you, you didn't have any facts to support**

17

**that he was actually renting to anybody.**

MR. SERFATY: Objection.

**A. To me, a multiple family dwelling is more important than a rental permit. That would come out in the wash anyway.**

Q. Could you explain what you mean by that?

A. Sure. What I meant was, if he has an illegal multiple and I write him for that, when it goes to trial or court and he pays a fine or whatever and they give him a notice, he's going to have to either convert the house back to the one-family and they get a rental permit then to rent it because he's not going to live there. So, eventually it would get to that point. **I just wrote [the summons] for the 68-40 because the house was arranged and designed as a two-family.**

T1081-82. (Emphasis added.) Thus, Stabile had no reason to believe that Norton was using the

House as a two-family dwelling, despite his previous assertions otherwise, and despite his under-

oath statement on the accusatory instrument that he had "personal knowledge" of the alleged

offense. A-200.

(2)      Stabile relied on Olmeda's faulty inspection

Although Olmeda never spoke to anyone at the House and had no idea whether the House

was being rented, he nonetheless forwarded the "Summon" Request Form to the Law

Enforcement Division. Stabile then relied on Olmeda's non-existent inspection. Stabile testified,

"[a]ll I know is, when I get this [request from Olmeda], there is a violation and I go out and then

it is a second opportunity for the landowner to get the thing cleared, because by the time I get

there, he has had long enough time to get that taken care of." T1010-11, p. 72-73. Neither

Olmeda nor Stabile performed anything resembling a proper inspection or investigation. Yet,

both moved forward with accusations and charges against Norton, despite zero evidence that the

House was being used as a two-family dwelling.[3]

---

[3] To the extent that Defendants argue Norton has admitted to renting to two families during this litigation (*see* Individual Defendant's Memorandum of Law, p. 29) any such admission is immaterial to the question of probable cause, since it came after the criminal action terminated. "[T]he determination of whether sufficient probable cause exists to defeat a claim of malicious

18

(3)     Stabile's admissions came after prior rulings

To now, the crux of Norton's arguments over lack of probable cause have centered on defects with the Certificate upon which Stabile and Huml relied, not the defects with Stabile's investigation. (*See, e.g.* Dkt. 104, p. 35: "Plaintiff does not contest the veracity of Investigator Stabile's allegation that the Premises were used as a two-family dwelling.") However, Stabile's admissions about his investigation only came in 2014, long after all the prior motions and decisions relating to the prosecution. Thus, when the Second Circuit held "[w]e have no trouble concluding that it would have been 'objectively reasonable' to believe…based on those two items of information, that there was probable cause to commence a criminal prosecution against plaintiff" the two items of information it was referring to were the unsigned, unsealed, and undated Certificate and the inspection Stabile conducted "to confirm that it was being used as a two-family dwelling." Norton v. Town of Islip, 378 F. App'x 85, 88 (2d Cir. 2010). When that ruling was issued in 2010, neither the Court or Norton knew that Stabile would later admit that he never knew if the Property was being used as a two-family dwelling.[4]

b)     Stabile did not Know that the Alleged Use of the
            Property was Inconsistent with Last-Issued certificate

Stabile has testified that, "As a Code Enforcement Investigator, my official functions included ascertaining a property's legal status and rights, so as to determine whether its current uses were in violation of the Town Code and building codes." Dkt. 219-1, Stabile Decl., 6-22-15,

---

prosecution must be made as of the time the accused was charged, arraigned, or indicted.") Chroscielewski v. Calix, 2018 WL 324872, at *23 (E.D.N.Y. Jan. 8, 2018).

[4] Therefore, as this is the first opportunity Norton has had to contest probable cause based on Stabile's admissions. Because it has not been previously considered by the Court, this argument is appropriate under the Court's April 23, 2020 Order. *See* Ex. 45 (April 23, 2020 Tr., p.71: "you do need to stick to new arguments, i.e., arguments that have not been made before or could not have been made before. And we aren't going to revisit rulings that were made previously with a full record and with no intervening changed case law".

¶ 4. In "ascertaining" this Property's legal rights and status, however, Stabile referred to an unsigned, unsealed, and undated front side-only Certificate, and did not bother to look at a court decision which was relevant.

As shown below, even assuming Norton was using the Property for two-family purposes (which Stabile did not know of), no C/O said such use was illegal.

(1)    Court has already determined that the Certificate was invalid

In bringing the criminal action, Stabile referred to an unsigned, unsealed, and undated front-side Certificate, which he contended was the "last issued certificate of occupancy" and which he contended forbade Norton's use of the Property for two-family residence purposes. A-200. However, in Norton I, Judge Garaufis found that this Certificate "did not carry any legal effect". Norton I, 239 F. Supp. 2d 274, fn. 6. Judge Garaufis held that the "last issued C/O" was actually the 1990 C/O and that the Premises will continue to enjoy its status as a nonconforming use until the Town revokes this status in a manner conforming with the requirements of due process". Id. at 276. Thus, as a matter of law, the Certificate which underpinned the prosecution was invalid and could not have lawfully supported the charge.

In this action, Judge Garaufis held the Certificate was "facially invalid." Dkt. 104, pg. 42. Even before that ruling however, Stabile and Huml should have realized the same. The unsigned, unsealed, and undated Certificate states below its signature line, "Official copy must have original seal and signature." A-203.

A certificate of occupancy may be one entry on the building division certificate" (T17). At a 2015 deposition, a Town 30(b)(6) witness adopted the testimony of prior Building Division Commissioners as "true and correct statements of the town's policies while those prior commissioners were in commission." (T2037.) Giedraitis was Commissioner from March 26,

20

1990 to May 11, 1997. (Ex. 51, TD000255.) He was Commissioner when the accusatory instrument was issued and when the criminal summons was issued. *See also* Huml's 2014 admission (T1490-91) that the 1965 nonconforming use entry on the Certificate was neither a certificate of compliance nor a certificate of occupancy entry. It should have been long evident, therefore, that the unsigned, unsealed, and undated front side Certificate Stabile and Huml relied on was defective on its face.

(2)    The Town knew that the Property's legal Non-conforming use status was still intact,  therefore there could not have been probable cause to charge Norton for a use consistent with that status

(a)    The Town knew that only the BZA Could revoke a non-conforming use

The Town knew that only the BZA could revoke a non-conforming use, and knew that never happened. This, the Town knew that it did not have probable cause to believe that the property was being unlawfully used as a two-family in violation of the last issued C/O.

When Norton was denied a rental permit in 1988, he filed an Article 78 petition challenging the denial. A-307-14. In ruling on the petition, the Suffolk County Supreme Court held that the Town was "not empowered to pass on the establishment of a non-conforming use," and that "only the [Town's Zoning] Board of Appeals could determine whether the Property "is a legal non-conforming two family structure." A-548-54. On a motion for reconsideration, the Supreme Court again held that "the establishment of whether or not such [legal non-conforming use] status was lost, was the function of the [Town's] Zoning Board of Appeals." 56.1 ¶ 25. Judge Garaufis then found that in the Article 78 proceeding, "the Town acknowledged that it had not officially revoked Plaintiff's nonconforming use and that the validity of the use still needed to be determined by the Town's Zoning Board of Appeals." Norton I, 239 F. Supp. 2d 267.

Despite the Article 78 Court's instruction to the Town, "[d]uring the period between 1989 and 1997, the Town never initiated any administrative proceeding before the Zoning Board of Appeals or commenced any other proceeding to terminate the nonconforming use. Nor did the Town ever formally notify Plaintiff that his property's legal nonconforming use had been terminated. Indeed, up to the present time, the Premises continues to be annually assessed and taxed by the Town as a legal two-family residence." Norton I, 239 F. Supp. 2d 267. In fact, after the Article 78 Court ruled, the Town issued a C/O in 1990, which confirmed the Property continued to enjoy legal non-conforming use status. A-584.

Here, the Town has affirmed the exclusive jurisdiction of their BZA on this issue. For example, the Town in Norton I replied to an interrogatory asking them to "[i]dentify the person or persons who, acting on behalf of the Town, determined that the Premises' Legal Nonconforming Use as a two-family dwelling was terminated, revoked or otherwise lost" by stating, "…the New York State Supreme Court has already preclusively determined that the Zoning Board of Appeals possesses exc1usive jurisdiction concerning this issue…" A-229. *See also* an identical response at A-230.

The 1989 Article 78 proceeding informed the Town that only its BZA could revoke the Property's non-conforming use status. The Town has acknowledged this. Despite this, the Town never brought this matter to the BZA. Instead, it waited eight years and charged Norton with a criminal offense for using his Property in a manner Defendants' knew he still enjoyed. Everyone involved in the prosecution knew this determination was the exclusive province of the BZA and knew that the BZA did not make such a determination. The Certificate itself refers to the Article 78 decision, which specifically says the same. Thus, there was never probable cause to believe that the Property was being used inconsistently with the last issued C/O.

(b)    Case law shows the non-conforming
use was not lost

Besides the failures to heed the Article 78 Court regarding the BZA's authority, Defendants also failed to follow New York case law which showed the Property possessed non-conforming use status. While the revoking notations on the Certificate said that the non-conforming use was "lost due to non-use in excess of one consecutive year and failure to apply for repair permits" (A-203), binding case law existing at the time of the criminal action held that, "[a] use which is otherwise lawfully maintained may be continued as a nonconforming use although the user failed to procure or renew a license, certificate, or other permit required by law * * * The failure to obtain a license does not render the use unlawful in the sense intended by zoning ordinances which preserve existing lawful uses". Kennedy v. Zoning Bd. of Appeals, 205 A.D.2d 629, 631, (2d Dep't 1994); *see also* Matter of Rubin v. Wallace, 63 A.D.2d 763 (3rd Dep't 1978); City of New York v. Victory Van Lines, 69 A.D.2d 605 (2d Dep't 1979)).

At the very least Huml, a New York licensed attorney, should have known the state of the law as it existed when Norton was charged, and should have known that failing to obtain a permit did not lead to the loss of a legal non-conforming use. Giedraitis was also unreasonably wrong on this issue.

(3)    Even if the Certificate was signed, its contents
did not support a finding of probable cause to
justify criminal charge

Even if the Certificate had been signed, its contents still did not support the conclusion that the Property's non-conforming use status had been lost. To reach his conclusion that the non-conforming use had been revoked, Stabile relied on notations placed on an unissued Certificate by Giedraitis. Giedraitis however, testified he never intended for those notations to revoke anything.

23

Both of Giedraitis' Certificate notations were preceded by asterisks. Giedraitis testified, "[w]hat this [the second entry, including the asterisk] says is there was a decision by the Court. You want more details, go to the decision. That's what this [second entry] says. That's the only purpose of this statement. Go to the decision. It means there is something that affected the use of this property, and any subsequent property owner before he buys the property is going to say what does this mean. Go to the Suffolk County Supreme Court decision and read it. You cannot summarize a ten page document on two lines and be completely clear as to all the ramifications" 56.1 ¶ 53. T67-T68. Stabile testified he had no idea what the asterisks meant, saying they were "probably just something they did for whatever reason. I don't know." T1124. Similarly, Huml said she had "no idea" why the asterisks were on the Certificate. T1494. See also Stabile and Hunl's Response to Norton's Notices to Admit no. 4 (Ex. 22). Notwithstanding this, both initiated and continued the criminal action against Norton.

Finally, the unissued front-side Certificate notations should not have been relied on to show that the legal non-conforming use was lost, since they are contradicted by other Certificate entries. The notations in question state, "Rental permit for two-family DENIED 23 Mar 88 Non-conforming use of two-family lost due to non-use in excess of one consecutive year and failure to apply for repair permits." 56.1 ¶ 28. However, the reverse side of the Certificate shows a duplicate certificate was issued on January 3, 1990 to Bellos Carpentry. Ex. 1, NORTON000576. The January 3, 1990 certificate is the one that Judge Garaufis declared as the true "last issued" C/O. Norton I, 239 F. Supp. 2d 276. It would have been logical for anyone viewing the entire certificate to conclude that the use was not lost before March 23, 1988, since a certificate was issued nearly two years later, on January 3, 1990.

24

(4)     Failure to make further inquiry into the
Property's status was unreasonable and evidenced a
lack of probable cause

The New York Court of Appeals has found that "the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause". Colon v. New York, 60 N.Y.2d 78, 82 (1983). Here, neither Stabile nor Huml made further inquiries which would have shown that probable cause did not exist. For example, they should have viewed the reverse side of the Certificate. If they had, it would have revealed to them that a certificate was issued for the Property in 1990, two years after the use was allegedly lost. They could have talked with Giedraitis, who actually authored the asterisked notations upon which they claim reliance. If they had, they would have discovered the "only purpose" of the notations was to inform subsequent Property buyers "there was a decision by the Court. You want more details, go to the decision." 56.1 ¶ 53. They could have actually read the decision cited on the Certificate. If they had, they would have known that the Suffolk County Supreme Court held that whether the Property enjoyed non-conforming use status was a matter "only the Board of Appeals, not the [Town], can determine" and that, "[t]he review of such determination and the establishment of whether or not such status was lost, was the function the Zoning Board of Appeals." 56.1 ¶ 7. They could have checked Building Department microfiche, which would have shown that the last microfiched entry for the Property (an "Addl. Data" entry) was dated May 21, 1990, long after the 1984 fire and alleged loss of use. Despite this, the microfiche contains no revoking notations. Ex. 46, NORTON000515-20.

A jury could find Defendants' failure to make and of the further inquiries listed above was unreasonable under the circumstances and evidenced a lack of probable cause. Hayes v. City of New York, 29 A.D3d 521, 523 (2d Dep't 2006).

(5)     The issuance of 1997 certificate shows knowledge
of no probable cause

In response to Norton's motion to dismiss the criminal action, the Town filed the front side only of a newly issued certificate with the Court dated October 21, 1997, almost seven months after the criminal action was filed. A-692-98. Had Defendants' determined the Certificate referred to by Stabile established probable cause, the Town never would have issued a new certificate seeking to *post facto* support charges it brought months earlier, and would not have alleged a certificate issued in October 1997 was violated in March 1997. 56.1 ¶ 89; A-202-03.Thus, when the 1997 certificate was issued, the Town knew it did not have probable cause at the time of the prosecution.

### 3.     *Probable Cause was Lacking at Various Times after Initiation of Prosecution*

Even if, *arguendo*, probable cause existed when Norton was charged, "continuation of a criminal proceeding without probable cause amounts to malicious prosecution" Coleman v. City of N.Y., 49 F. App'x 342 (2d Cir. 2002). After the prosecution was initiated, there were at least four separate times when either Stabile, Huml, and/or the Town should easily have realized, if they didn't know earlier, that there was no probable cause to support and maintain the prosecution.

First, they should have known when Norton's attorney asked for a copy of the "last issued" C/O upon which the charge was based. Ex. 18. In response, Huml provided him with an unsigned, unsealed, undated, and invalid Certificate bearing a "Dept Copy" stamp. A-202-03. Stabile has acknowledged that the "Dept Copy" stamp was "like my mark", so he "knew that [he had] stamped it, so I know I did that because nobody else did that as far as I know." T1283. He also testified that the stamp shows it is a copy and not the original document. T1005, p. 51. Even

if they had not realized it when the prosecution was commenced, Huml, Stabile and the Town should have known at this point, that the prosecution was initiated based on an unsigned, unsealed, undated (and therefore unissued and invalid) document.

Second, after he was charged, Norton moved to dismiss the prosecution. A-668-91. In opposition to Norton's motion, the Town filed a certificate with the court that was signed and dated October 21, 1997 – almost seven months after the accusatory instrument was filed. A-200. The Town obviously knew, at this point, that there was no evidence to show that Norton had violated a certificate of occupancy on March 5, 1997. Otherwise, they would not have been forced to issue a new post-dated certificate. As Judge Garaufis held, "[t]he 1997 C/O, post-dating the commencement of the Criminal Action, could not possibly provide the support for that charge." Dkt. 104, p. 34.

Third, as is detailed in Norton's Opposition to the Summary Judgment Motion of the Town, Division of Law Enforcement Director Timothy Shea should have known that the prosecution was not supported by probable cause when he was presented with evidence of the same in 2000. (See Norton's Opposition to the Summary Judgment Motion of the Town of Islip, p.12)

Finally, the Town should have known that there was no probable cause for the prosecution after Judge Garaufis explicitly told it as much. Despite this, however, the Town Attorney continued the prosecution even after the Norton I ruling, not because he believed he could prove the charge against Norton, but because of an ulterior motive. (See Norton's Opposition to the Summary Judgment Motion of the Town of Islip, p. 13-15)

### 4. The Suffolk County Court's Denial of Norton's Motion to Dismiss does not Give Rise to Presumption Probable Cause

Defendants argue that the denial of Norton's motion to dismiss the criminal charge

creates a presumption of probable cause which requires the dismissal of his malicious prosecution claim.

The Second Department has analyzed the presumptions that flow from certain criminal court decisions, and their impacts on subsequent malicious prosecution claims. "[W]hile a Grand Jury indictment or a decision by a Magistrate to hold an accused after a preliminary hearing raises a presumption of probable cause in a subsequent malicious prosecution action, the denial by a trial court of a trial order of dismissal does not." Landsman v. Moss, 133 A.D.2d 359, 361 (2d Dep't. 1987). In concluding this, the Court reasoned that "both a determination to hold a defendant for the action of a Grand Jury after a preliminary hearing upon a felony complaint, as well as the Grand Jury indictment itself, are predicated upon a finding of reasonable cause to believe that the defendant committed the subject offense…In contrast, the standard for the issuance of a trial order of dismissal is that the trial evidence was not legally sufficient to establish the offense charged or any lesser included offense…Evidence may be legally sufficient to support a charge although it does not provide reasonable cause to believe that the defendant committed the [criminal violation] charged." Landsman, 133 A.D.2d 360-61.

Here, the Criminal Court's denial of Norton's motion to dismiss was not "predicated upon a finding of reasonable cause to believe that the defendant committed the subject offense." Instead, it was only based on the fact that "[t]he moving and answering papers raise factual issues that are properly the subject of a determination on the merits at trial." A-666. *See also* Phelps v. City of New York, 2006 U.S. Dist. LEXIS 42926, at *13 (S.D.N.Y. June 27, 2006) ("[b]ecause Phelps was not indicted, but only charged with misdemeanor violations, a presumption of probable cause does not apply").

Even if the Criminal Court's ruling had been predicated on a finding of reasonable cause

to believe Norton committed the offense, the presumption created by such a holding would be rebuttable. Gisondi v. Harrison, 72 N.Y.2d 280 (1988). Here, such a finding is rebutted by the two facts. First, the criminal court did not consider Stabile's later admissions that he had no idea who lived at the Property, or whether any were renters. The Court couldn't evaluate these admissions, since they weren't made until 2014, over 16 years after the dismissal decision. Second, the holding Defendants rely on was, in effect, overruled in 2003, when the Criminal Court dismissed the criminal charges against Norton, holding that the Norton I decision, "constitutes [a] legal impediment to conviction of the defendant for the offense charged herein." A-800.

Finally, the motion to dismiss was denied after the fabrication of evidence which did not exist when the prosecution was initiated or for seven months thereafter. Nor did the motion to dismiss decision account for Judge Garaufis' decision or any of the facts which highlighted the obvious lack of probable cause. Thus, the decision on the motion to dismiss is not dispositive, is rebuttable, and is inapplicable to the time the prosecution was initiated and to various times thereafter.

### B.      Malice

#### 1.      Malice May be Inferred

The Second Circuit has held that malice and the lack of probable cause are closely linked elements. "In most cases, the lack of probable cause – while not dispositive – 'tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause." Lowth v. Cheektowaga, 82 F.3d 563, 573 (2d Cir. 1996). "[M]alice may [also] be shown by proving that the prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff." Ying Li v. City of N.Y.,

246 F. Supp. 3d 578, 614 (E.D.N.Y. 2017). Here, for the reasons stated above, the action was commenced and maintained without probable cause. Further, the reasonableness of such an inference is highlighted by the fact that the prosecution lasted for nearly six years, during which time, there was ample notice, at varying stages, that probable cause did not exist. Yet, the prosecution continued. The fact that it continued even after the decision in <u>Norton I</u>, which made it unequivocally clear that there was no probable cause, permits an inference of malice. Messina explained that the prosecution continued for a reason other than Norton's guilt. The fact that Messina continued the prosecution for an ulterior motive highlights the existence of malice and a jury is free to infer that the ulterior motive existed long before Messina's admission of same or the <u>Norton I</u> decision.

Additionally, Stabile's accusatory instrument against Norton stated that the prosecution was "based on personal knowledge." A-200. But, that was never the case as he never had knowledge that the property was being <u>used</u> as a two family dwelling. Id. "New York law has long equated the civil defendant's failure to make a full and complete statement of the facts to the District Attorney or the court, or holding back information that might have affected the results, with that defendant's initiation of a malicious prosecution". <u>Ramos v. City of N.Y.</u>, 285 A.D.2d 284, 299-300 (App. Div. 1st Dept. 2001).  Further, Huml directed the fabrication of evidence (the 1997 C/O) because the Town knew there was no probable cause and yet, it still wanted to maintain the prosecution despite knowing that the fabrication of evidence was necessary to even advance an argument about probable cause, albeit a weak argument. Additionally, as noted on pages 24-25, wherein we list a litany of steps that any reasonable person would have taken to investigate the matter and the Town's failure to take those steps, this too can lead to an inference of malice. Or worse, a jury could believe that the Town must have taken some or all of those

30

steps and intentionally ignored the fact that those steps unequivocally established that there was no basis for the prosecution. In sum, given the Town's commencement and continuation of a wholly defective prosecution, despite the obvious defects, a jury may infer malice. Finally, Huml's involvement in the investigation and prosecution, at all steps shows, malice. At a minimum, there are numerous issues of fact for a jury to decide regarding malice.

## II.   Heien v. North Carolina

In 2010, the Second Circuit held it was an "objectively reasonable" mistake for Huml and Stabile to believe that probable cause existed for the Norton's prosecution. 378 Fed. Appx. 85, 88. In 2014, the United States Supreme Court held that, "reasonable mistakes of law, like those of fact" justify probable case. Heien v. North Carolina, 574 U.S. 54, 63 (2014). Thus, Defendants argue that, "summary judgment in favor of all of the remaining defendants is now plainly warranted on probable cause grounds." This conclusion, however, represents a misreading of both Heien and the Second Circuit's order.

### A.   Heien is Inapplicable

Heien involved a police officer who pulled over a car due to a non-functioning brake light. Id. at 57. The officer subsequently discovered drugs in the vehicle and charged the petitioner with attempted drug trafficking. Id. at 58. The North Carolina Court of Appeals suppressed the evidence because the initial stop was not valid as North Carolina law requires only one, not multiple, working brake lights. Id. The State appealed, and the North Carolina Supreme Court reversed, concluding that the police officer could have reasonably, if mistakenly, read the law to require that both brake lights be in working order. Id. at 59. The Court held that because the officer's mistake of law was reasonable, the stop was valid, and the evidence acquired as a result thereof should not be suppressed. Id. The  Supreme Court affirmed this decision. In doing so, however, the Court clarified that its holding applied only in narrow

31

circumstances, such as where "an officer may 'suddenly confront' a situation in the field as to which the application of a statute is unclear however clear it may later become." Id. at 66. As Justices Kagen and Ginsberg wrote in their concurrence, "A court tasked with deciding whether an officer's mistake of law can support a seizure thus faces a straightforward question of statutory construction. If the statute is genuinely ambiguous, such that overturning the officer's judgment requires hard interpretive work, then the officer has made a reasonable mistake. But if not, not...the statute must pose a 'really difficult' or 'very hard question of statutory interpretation...such cases will be 'exceedingly rare.'" Id. at 70. For the reasons stated below, Heien is inapplicable here.

### 1.     *Heien Dealt with Close Calls made under Sudden Circumstances*

Unlike the police officer in Heien, the Individual Defendants were not "suddenly confronted" with a situation where the application of a law was unclear, and they were not called upon to make a sudden judgment call on a matter of close statutory construction. Indeed, the Individual Defendants had no time constraints in making their prosecution decision or the repeated subsequent decisions to maintain the prosecution without probable cause.

In Heien, the police officer had mere moments – from when he first saw the faulty brake light to the time he pulled the vehicle over – to decide whether the stop was justified under North Carolina law. Cases in this Circuit following Heien show officers presented with similarly pressing questions of law, all of which relate to statutory interpretation. *See, e.g.*, United States v. Diaz, 854 F.3d 197, 203-05 (2d Cir. 2017) (officer faced with immediate question of whether an open container law applied to individuals she found drinking in the stairwell of an apartment building); Aristide v. City of New York, 2017 WL 5905549 (E.D.N.Y. 2017) (defendant publicly accused officer of being undercover; officer was presented with the question of whether the

deliberate exposure of a police operation through words alone violates a New York statute on "obstructing governmental administration", thus justifying immediate arrest); Foy v. City of New York, 2019 WL 3717317 (E.D.N.Y. 2019) (unpublished) (question of whether an arrest for jaywalking and subsequent search was justified when defendant was crossing in a marked vs. unmarked crosswalk); Uzoukwu v. Krawiecki, 2016 U.S. Dist. LEXIS 153449 (S.D.N.Y. 2016) (whether a park rule barring adults without children applied to the specific area of the park in which defendant was arrested); Corso v. City of New York, 2018 WL 4538899 (S.D.N.Y. 2018) (whether knife that defendant possessed on the subway qualified as a "weapon" or "dangerous instrument" under 21 NYCRR § 1050.8, thus justifying his immediate arrest and search); United States v. Wofford, 2021 WL 95916 (W.D.N.Y. 2021) (vehicle engaged a turn signal approximately one-vehicle length before a stop sign, officer had to decide whether this justified a stop under seemingly contradictory sections of New York Vehicle and Traffic Law); United States v. Loyd, 2020 U.S. Dist. LEXIS 74480 (W.D.N.Y. 2020) (officer saw a man urinating against the side of a building and had to immediately decide whether this violated New York's public exposure statute and therefore justified a search incident to arrest).

The cases above involved officers confronted with the immediate decision of whether to arrest based on close calls of statutory interpretation, the opposite of what happened in this case, where there were no time constraints and there was no ambiguity in a statute – in fact, statutory interpretation was not implicated at all. Here, Olmeda requested a "Summon" be issued on October 12, 1995. E3. 510 days passed before Stabile went to the Property to perform his investigation, on March 5, 1997. T999, p. 28. Another 15 days passed before Stabile signed the Accusatory Instrument on March 20, 1997. A-200. After that, 28 days passed before the criminal summons was issued on April 17, 1997. A-201. Then another 27 days passed before Norton was

arraigned on May 14, 1997. 56.1 Counterstatement C. From the day Olmeda requested a "Summon" until the day Norton was arraigned was 580 days, or over 19 months, had passed. No one had to make any "on the fly" decision. Heien, 574 U.S. 66. No one was arrested on the spot. The Individual Defendants had well over 1.5 years to decide whether to prosecute Norton and faced no issue of statutory interpretation. They cannot now rely on narrowly drawn Heien exceptions in to justify their wrong decisions.

### 2.   *Heien Does not Apply to State Claims*

Even if this case involved a close call of statutory determination made under sudden circumstances regarding a truly ambiguous law, Heien still would not apply to Norton's claims against the Individual Defendants.

Norton's only claims against Stabile and Huml are under New York state law for malicious prosecution. Heien only considered a question of federal law - whether the traffic stop violated Fourth Amendment to the US Constitution. When the New York Court of Appeals first considered Heien's impact on questions of New York law, it only extended its reach to traffic stops. "In this appeal, we are asked to decide whether there is probable cause to make a traffic stop for a suspected violation of law in accordance with article I, § 12 of the New York State Constitution and the Fourth Amendment of the United States Constitution if the justification for the stop is based upon a police officer's objectively reasonable, but mistaken, view of the law." People v. Guthrie, 25 N.Y.3d 130, 132 (2015).

Since then, almost every time a New York court has analyzed state law claims given Heien, the court has only done so in the context of whether a traffic stop was justified.[5] (*See, i.e.*, People v Abrucci-Kohan, 52 Misc. 3d 919 (Justice Ct. Orange Cnty. 2016); People v Paniccia,

---

[5] The only exception is People v Perkins, 184 A.D.3d 776 (2d Dep't 2020), where the Court briefly mentioned Heien. However, no state law civil claims were made in Perkins, where the Court was only considering suppression of evidence in a criminal case.

61 Misc. 3d 397 (City Ct., Gloversville 2018); People v Del Rio, 61 Misc. 3d 944 (City Ct., Middletown 2018); People v Pena (Robin), 36 N.Y.3d 978 (2020); People v Maeshack, 2018 N.Y. Misc. LEXIS 5185 (City Ct., Peekskill 2018); People v Turner, 176 A.D.3d 1623 (4th Dep't 2019); People v. T.B., 67 Misc 3d 1214(A) (Sup. Ct., Kings Cnty. 2020); People v Hinshaw, 35 N.Y.3d 427 (2020); People v Pena, 36 N.Y.3d 978 (2020).) Further, a search of case law reveals no published federal case in this Circuit that has applied Heien to state law claims. Thus, Heien is not applicable at all.

**B.    Second Circuit Decision Does Not Impact Analysis Here**

The Second Circuit decision that Defendants rely on is of limited applicability here, for two reasons. First, it only dealt with whether Defendants were entitled to federal qualified immunity. Second, the facts the Second Circuit relied on to decide have now been shown to be erroneous.

*1.    Second Circuit Decision Dealt with Qualified Immunity Only*

The Second Circuit's ruling was limited to whether the Individual Defendants were entitled to federal qualified immunity. 378 Fed. Appx. 85, 88. The Court here is considering a different question with a higher bar – as the Supreme Court in Heien specifically held: "the inquiry is not as forgiving as the one employed in the distinct context of deciding whether an officer is entitled to qualified immunity for a constitutional or statutory violation." 574 U.S. 67. "[T]he inquiry the Court permits today is more demanding than the one courts undertake before awarding qualified immunity. See Tr. of Oral Arg. 51 (Solicitor General stating that the two tests 'require essentially the opposite' showings)" 574 U.S. 69-70. (Some internal citations omitted.) See also Askins v. Doe No. 1, 727 F.3d 248, 253-254 (2d Cir. 2013) (Monell constitutional violations are not barred by the doctrine of federal qualified immunity).

This Court has already held that even if certain actions of the Defendants were

objectively reasonable that "does not foreclose a finding of bad faith." Dkt. 160, p. 10. "[T]hat it was objectively reasonable for [any individual defendant] to believe that he was not engaged in malicious prosecution does not necessarily foreclose a reasonable jury from concluding that he was [engaged in malicious prosecution, an element of which is malice]." Rohman v. N.Y. City Transit Auth., 215 F.3d 208, 218-19 (2d Cir. 2000). If the Second Circuit's objective reasonableness finding also resolved the question of good faith, this case would not have been remanded for this Court to consider the state law immunity question. On the contrary, "under New York law a defendant's claim of qualified immunity is undone by her failure to disprove *either* unreasonableness *or* bad faith." Dkt. 160, p. 10. (Emphasis in original.)

As the Second Circuit applied only the federal qualified immunity standard when determining that the mistake of the Defendants was "objectively reasonable," that holding cannot be relied on now, when the standard is much higher, and cannot be relied on where, as here, the Defendants have not disproved either unreasonableness or bad faith.

### 2.   *Facts Underlying Second Circuit's Decision Have Changed*

The Second Circuit's decision was premised on the "undisputed" fact that "the Individual Defendants were confronted with two items of information at the time they chose to prosecute Norton. First, Individual Defendants had the Department Copy Certificate--the unsigned, unsealed, and undated certificate of occupancy marked 'DEPT. COPY'--that contained notations explaining that the house's legal nonconforming use had been 'lost.' Second, a Town investigator had visited the house to confirm that it was being used as a two-family dwelling." 378 Fed. Appx. 89. Discovery conducted after the Second Circuit's 2010 decision, however, revealed that these facts were not true.

As stated in Section 1(A), *supra*, Stabile has now admitted that he did not confirm that

the House was being used as a two-family dwelling. To the contrary, he said that he "didn't care who was living there" and only charged Norton because "the house was arranged and designed as a two-family." T1081-82. This subsequent admission undermines the entire basis for the Second Circuit's holding. Had the Second Circuit known this, it is more than hard to believe that it would have still found the actions of the Individual Defendants "objectively reasonable."

### C.    If <u>Heien</u> Applies, the Backgrounds of Stabile and Huml Should Factor into the Court's Analysis

Stabile was no rookie investigator. He holds an associate's degree in criminal justice and was just six credits shy of obtaining his bachelor's degree in criminal justice. (T995, p. 9.) He had been in law enforcement since 1974, having served as a police officer with the Pine Knoll Shores Police Department in North Carolina, as a Suffolk County welfare fraud investigator and as a licensed private investigator. <u>Id.</u>, T1047, T1181-T1182. He testified that this investigation involved "a basic illegal multi-family dwelling" and that he had "done a million of them" before. T1187. This shows that he should have known there was no probable cause and faced no time pressure to decide the same.

While <u>Heien</u> considered the case of a police officer who made a quick mistake of law in the field, Defendants put forward no cases which extend <u>Heien</u> to attorneys like Huml. To the contrary, courts have held different standards apply to police officers and lawyers when it comes to knowledge of the law. For example, in <u>Barboza v. D'Agata</u>, the court held that, "[t]he precedent distinguishing police officers from lawyers, which helps the officers, hurts [lawyers]. If cops are not expected to know what a lawyer would learn or intuit from researching case law…an assistant district attorney certainly is. And there surely is nothing unfair or impracticable about holding a trained lawyer to the standard of [a] trained lawyer." 151 F. Supp. 3d 363, 375-76 (S.D.N.Y. 2015) (internal citations omitted.) Similarly, the court in <u>Kijonga v.</u>

Seitzinger granted qualified immunity to a police officer who relied on the instructions of an attorney prosecutor, but denied that same immunity to the lawyer, as "[n]o Illinois prosecutor--a law-trained specialist in the enforcement of the criminal law of Illinois--could reasonably believe that Kijonka had committed a crime." 363 F.3d 645, 648 (7th Cir. 2004). The same is true here. Even if Stabile somehow could successfully show that he thought there was probable cause to believe that Norton was using the Property in violation of the last issued C/O, Huml certainly should have known better. Further, there was no mistake of law, and in any event they maintained the prosecution for years despite their knowledge that there was no probable cause.

## III.   **Proximate Cause**

Individual Defendants also argue that Stabile's reliance on the unsigned, unsealed, and undated Certificate did not proximately cause Norton's injury, because "[h]ad Stabile obtained a certified copy of the C/O before commencing the prosecution, it would have contained the exact same Notations, and the exact same prosecution for violating the C/O would have ensued."

This argument, however, ignores the fact that Stabile had no basis to believe Norton was unlawfully using the Property for two-family use purposes. He could have obtained a certificate signed in blood and this would not have justified the filing of a criminal charge against Norton when he had no evidence (and in fact, "didn't care") that the criminal violation being charged was actually committed.

Furthermore, a signature alone would not have alleviated all the problems with the Certificate. It would not have changed the fact that the Article 78 Court held that only the Town's Zoning Board of Appeals could revoke a non-conforming use, that Giedraitis said his notations were not intended to signify any use was revoked, or that the front side Certificate was, on its face, contradictory, because the back side indicated a certificate had been issued in 1990,

almost two years after the Certificate's front side notations indicated the "non-conforming use was lost." 56.1 ¶ 28. Defendants had all this information available to them, as it was repeatedly provided to them by Norton's attorneys.

## IV.    Qualified Immunity

Individual Defendants contend that they are entitled to New York qualified immunity for their prosecutorial acts because, "New York law recognizes a broad qualified immunity defense shielding government officials and their municipal employers from liability for any 'discretionary act,' so long as the act is not 'taken in bad faith or without a reasonable basis.'" Judge Garaufis addressed this issue in his 2013 Order, when he held that, "under New York law a defendant's claim of qualified immunity is undone by her failure to disprove *either* unreasonableness *or* bad faith." Dkt. 160, p. 10. (Emphasis in original.)

In light of the facts presented herein regarding the lack of a factual or legal basis for the prosecution, Individual Defendants have not met their burden of disproving either unreasonableness or bad faith. They are, therefore, not entitled to New York qualified immunity.

## V.    Huml's Involvement

In support of their motion, Individual Defendants repeatedly downplay Huml's involvement. (E.g., "Huml's involvement in Stabile's investigation was nothing more than being his supervisor" (Individual Defendants' Brief p. 34; Town Brief, p. 1, fn. 1); "[Huml] in fact had zero involvement with Stable's investigation" (Id. at 35); "everyone who testified to the investigation confirmed that Huml was not in the least involved" (Id. at 3)).

The facts, however, show Huml was much more involved than the Individual Defendants admit. As Director of the Division of Law Enforcement, Huml supervised its investigators, including Stabile. 56.1, ¶ 111. When Stabile investigated this matter, two calendar years had

lapsed since the notice of violation was provided to the Town's Division of Law Enforcement. Stabile testified that Huml made the assignments of cases that were this old. Id. After Stabile completed his investigation, he gave his report and the accusatory instrument to Huml. Id. Stabile also testified that Huml was "very involved in this, and she was my supervisor". Id. Huml sent Norton's attorney an unsigned, unsealed, and undated front side "DEPT. COPY" Certificate which she purported to be the Property's "last issued" C/O. 56.1 ¶ 111. Huml assigned (which means she (herself) retained primary control) Assistant Town Attorney Richard Sherman the responsibility of preparing an Affirmation in Opposition to Norton's motion to dismiss the criminal prosecution even though Sherman was not aware at the time of the requirements for an accusatory instrument . Id. Finally, in past briefs to this Court and to the Second Circuit, Defendants have repeatedly asserted that Huml is entitled to state and federal qualified immunity for her personal actions in this case. 56.1 ¶ 111 and the Second Circuit in its order, found Stabile and Huml "the individual plaintiffs [who] commenced the criminal proceeding" entitled to federal qualified immunity Norton II, 378 Fed. App'x at 88). If she had no involvement then she would not and could not be eligible for any immunity. Huml was deeply involved in this matter, and should not be excused from liability.

## CONCLUSION

Norton was criminally prosecuted based on non-existent investigations and a facially invalid document. Probable cause never existed against Norton. For these and for the other reasons stated above, Defendants' summary judgment motion should be denied.

Dated: April 19, 2021

Respectfully submitted,

LEEDS BROWN LAW, P.C.

By:

Andrew Costello